# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WATERLOO DIVISION

DEAN R. HOBSON

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-2050

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On June 14, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 4). The final decision of the Commissioner of Social Security is reversed and this matter is remanded for payment of benefits.

## I. PROCEDURAL BACKGROUND

Plaintiff Dean Hobson applied for Disability Insurance Benefits and Supplemental Security Income benefits on April 15, 2002, alleging an inability to work since November 11, 2001 (Tr. 44-96). Mr. Hobson's application was originally denied (Tr. 30-33), and denied again on reconsideration (Tr. 35-38). A hearing before Administrative Law Judge (ALJ) John P. Johnson was held on August 31, 2004 (Tr. 251-298). The ALJ denied Mr. Hobson's appeal in a decision dated October 27, 2004 (Tr. 14-20). The Appeals Council denied Mr. Hobson's request for review on April 28, 2005 (Tr. 6-8). This action for judicial review was filed on June 7, 2005.

## II. FACTUAL BACKGROUND

### A. Medical History

Mr. Hobson had a heart attack in April 1998 (Tr. 138). A cardiac catherization was performed at Allen Memorial Hospital in Waterloo, Iowa, which revealed an occluded right coronary artery, which was well collateralized from the left to right collaterals; mild to moderate disease in the circumflex and LAD but no significant focal lesion; and overall left ventricular systolic function which was near normal but inferior wall was akinetic (Tr. 139). It was decided that Mr. Hobson would be treated medically (Tr. 139).

On May 23, 2001, Mr. Hobson was seen at the Covenant Clinic in Waverly, Iowa complaining of tiredness, i.e., "He just feel [sic] tired out, doesn't have any gumption, sleeps all night and day. He missed the past two days at GMT. He went to sleep out in the waiting room." (Tr. 166). He was diagnosed as suffering from "tiredness, cause undetermined" (Tr. 166).

Mr. Hobson was admitted to Allen Memorial Hospital again on July 9, 2001, complaining of burning substernal chest discomfort lasting at least four days prior to his admission (Tr. 140, 142). He was diagnosed with a non-Q-wave myocardial infarction; two vessel coronary artery disease, dyslipidemia, elevated triglycerides, peripheral vascular disease, right common iliac stenosis with hip claudication, and tobacco abuse (Tr. 141, 144, 147). A cardiac catherization was performed and revealed a chronically occluded and recanalized right coronary artery (Tr. 140, 147). Mr. Hobson had 90% stenosis of the proximal circumflex and another 75% stenosis of the mid circumflex (Tr. 140, 147). The LAD had minor disease (Tr. 140). Mr. Hobson's LV was abnormal with inferior basilar and mid inferior akinesis (Tr. 140). There was no significant mitral regurgitation (Tr. 140, 147). The overall ejection fraction was normal (Tr. 140, 147). Mr. Hobson underwent a successful PTCA and stenting of the thrombotic proximal and mid circumflex, which reduced the stenosis from 90% to 0% proximally and from 75% to 9% in the mid circumflex (Tr. 140, 145). Mr. Hobson was counseled extensively about

smoking cessation, but he did not want any pharmacologic help (Tr. 141). Mr. Hobson was discharged on July 11, 2001 (Tr. 140).

Mr. Hobson was seen by Dr. Pamulapati, his cardiologist, at the Waverly Municipal Hospital on August 15, 2001 for a return visit (Tr. 216). Dr. Pamulapati's records of this visit that Mr. Hobson had right common iliac stenosis with right sided claudication and wanted to schedule a common iliac stent (Tr. 216). The records further indicate that Dr. Pamulapati again advised Mr. Hobson to quit smoking, to which Mr. Hobson replied that he had cut down to five cigarettes per day, but could not completely quit (Tr. 216). Mr. Hobson again refused Dr. Pamulapati's offer of pharmacologic help to quit smoking (Tr. 216).

On September 17, 2001, Mr. Hobson underwent a successful PTA and stenting of the right common iliac (Tr. 188). This procedure reduced the stenosis from 80% to less than 25% (Tr. 188).

Mr. Hobson was seen in the Waverly Municipal Hospital emergency room on January 17, 2002, complaining of chest pain (Tr. 180). He took four nitro pills and denied that he was suffering from any shortness of breath or having difficulty breathing (Tr. 180). A cardiac workup was done which revealed a normal electrocardiogram (Tr. 181). The emergency room physician opined that Mr. Hobson's chest pain was most likely musculoskeletal in nature (Tr. 181).

On October 21, 2002, Mr. Hobson underwent a stress test which was negative by EKG criteria (Tr. 212). The doctor's handwritten notation states "no significant abnormality to explain symptoms" (Tr. 213).

On December 3, 2002, Mr. Hobson's cardiologist, Dr. K. Mohan Pamulapati wrote Mr. Hobson's attorney a letter which stated, in pertinent part:

> His current symptoms are not consistent with angina pectoris and are mostly at rest. He is still smoking, unfortunately. Certainly, his chances of having another MI are high, but all we can do is try preventive medication. From a cardiac point of view I cannot say that we need to restrict activities, but

certainly discontinuation of smoking and treatment of
hyperlipidemia and regular exercise will help him.

(Tr. 214).

Mr. Hobson saw his family physician, Dr. John Brunkhorst on November 17, 2003
for a medication refill (Tr. 237). During this visit Mr. Hobson stated that he had not used
any nitro pills since last October and is "doing real well."

### B. Plaintiff's Subjective Complaints

Mr. Hobson completed a personal pain/fatigue questionnaire on May 23, 2002
wherein he alleged that he gets chest pain easily with exertion, which is usually relieved
by taking nitro pills, although the nitro pills give him headaches (Tr. 98). He is easily
nauseated and vomits, and had to leave work at times due to this (Tr. 98). Mr. Hobson's
chest pain does not follow a pattern, but is exacerbated by working in cold or hot weather,
which also causes him shortness of breath (Tr. 98). Mr. Hobson claims that he
experiences chest pain approximately once every two weeks, after which he is very tired
and must stay in bed for the next 24 hours to two days to get his strength back and feel
well again (Tr. 98). This has caused him to have a historically poor attendance record at
work (Tr. 101). Mr. Hobson claims that he tires easily and spends at least entire one day
per week in bed (Tr. 102).

Mr. Hobson further claims that his ability to lift and stand for long periods of time
is limited as a result of a 1986 back injury (Tr. 99). When he does a lot of lifting or
standing, his back hurts and he must rest to alleviate the pain (Tr. 99). Mr. Hobson also
gets leg cramps when standing too long or when walking too far (Tr. 102, 104).
Mr. Hobson claims that it may not bother him to lift 50 pounds once in a while, but that
constant lifting bothers his back (Tr. 103).

Mr. Hobson describes his daily activities as getting up every day, taking his
medicine, fixing himself breakfast, making sure his daughter gets off to school on time,
walking at times, messing around in his garage, washing dishes, and washing clothes
(Tr. 104). Mr. Hobson states that he sleeps for an hour to two hours in between activities

when he gets tired. Mr. Hobson claims that he does no yard work or strenuous exercise at all (Tr. 104). When his wife gets home from work they have supper and watch television together or go for a drive (Tr. 104).

Mr. Hobson completed another personal pain/fatigue questionnaire on September 4, 2002, which was consistent with his prior questionnaire, and with a chest pain questionnaire he completed on the same date. In his chest pain questionnaire, Mr. Hobson described the chest pain he experiences as sharp and sometimes radiating down his arms, causing his fingers to get numb and the skin on his fingertips to turn white (Tr. 115). Mr. Hobson stated that his chest pain is relieved after he takes his nitro pills and rests (Tr. 115, 116). He claimed that his chest pain was brought on by exertion, i.e., any walking, mowing, or shoveling snow, as well as exposure to cold air or hot days (Tr. 115). Mr. Hobson stated that he gets very short of breath just going down a short flight of steps to the basement (Tr. 115). He claimed that he could walk approximately four blocks in 10 minutes before having to stop and rest because he is short of breath (Tr. 116). He stated that he can lift and carry up to 50 pounds, but not for very long (Tr. 116).

Mr. Hobson completed a daily activities questionnaire on September 4, 2002 wherein he stated that he has no problems with his self-care (Tr. 121). He further stated that his sleeping habits had changed in that he sleeps "all the time" i.e., he wakes around 7:00 a.m., takes a two-hour nap around 11:00 a.m., and then goes to bed between 8:00 and 10:00 p.m. (Tr. 121). He claimed that he rarely does dishes, takes out the trash, does home repairs, washes the car, mows the lawn, rakes, leaves, or does garden work (Tr. 121). Mr. Hobson explained that he had not mowed the yard or raked all summer because it causes him to become short of breath and have chest pain (Tr. 121). He further stated that he spent most of the summer in his house because the hot weather exacerbates his shortness of breath and chest pain (Tr. 121). Mr. Hobson stated that he does no cooking or shopping, but that he does go to the bank and to get his hair cut by himself (Tr. 122). His wife goes with him to all of his doctor appointments (Tr. 122). He drives

everyday (Tr. 122). He stated that he has no problems taking his medications and that there are no side effects from his medications (Tr. 122). On "good days," Mr. Hobson goes to the river and fishes from the bank for an hour or so, although this usually tires him to the point that he spends the next day in bed (Tr. 123). He watches television, sometimes reads part of the Sunday newspaper, and has visits from his four brothers and brother-in-law on a regular basis (Tr. 123). Mr. Hobson stated that he can only walk a few blocks before he is short of breath and that he breathes better the more rest periods he takes (Tr. 124).

### C. Competing RFCs

On June 10, 2002, Mr. Hobson had a disability physical performed by consulting physician Dr. Nagarathnamma Nadipuram(Tr. 201-202). Dr. Nadipuram assessed Mr. Hobson as suffering from severe coronary artery disease and severe peripheral vascular disease (Tr. 201). Dr. Nadipuram further opined that "[t]he patient is unable to perform his routine job because of his severe coronary artery disease" (Tr. 201). Dr. Nadipuram's report further states "[b]ecause of his severe coronary artery disease, I could see his disability to perform an 8-hour job five days a week to do his living" (Tr. 202).

On June 24, 2002, state consulting physician Dr. J.D. Wilson completed a physical residual functional capacity assessment on Mr. Hobson (Tr. 207-211). Dr. Wilson opined that Mr. Hobson could lift and/or carry 20 pounds occasionally and 10 pounds frequently (Tr. 207). Mr. Hobson could stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull (Tr. 207). Dr. Wilson explained his exertional limitations with a detailed summary of Mr. Hobson's medical history (Tr. 207-08). Dr. Wilson further opined that that Mr. Hobson could occasionally climb, balance, stoop, kneel, crouch and crawl, and had no manipulative, visual, or communicative limitations (Tr. 208-09). Dr. Wilson advised that Mr. Hobson should avoid concentrated exposure to extreme heat and cold (Tr. 210). Dr. Wilson opined that Mr. Hobson's symptoms are attributable to a medically

determinable impairment, are not disproportionate to the expected severity or duration of Mr. Hobson's impairments, and are consistent with the total medical and non-medical evidence (Tr. 210). Dr. Wilson found Mr. Hobson to be "credible to the extent that he does have a medically determinable impairment that does restrict his function" and that "[t]he evidence in file is consistent with the reports of claimant" (Tr. 210). Dr. Wilson disagreed with Dr. Napiduram's restrictions, noting they are not consistent with the findings on examination as there are no reports indicating that Mr. Hobson is limited in performing other work duties (Tr. 211). On October 30, 2002, state consulting physician Dr. John May completed a physical residual functional capacity assessment of Mr. Hobson's that was identical to Dr. Wilson's (Tr. 217-224).

On August 27, 2004, Dr. Brunkhorst completed a cardiac residual functional capacity questionnaire, a form provided by Mr. Hobson's attorney, which identified Mr. Hobson's symptoms as chest pain, shortness of breath and fatigue (Tr. 242). Dr. Brunkhorst stated that Mr. Hobson is not a malingerer and does have marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though he is comfortable at rest (Tr. 243). Dr. Brunkhorst opined that Mr. Hobson would frequently experience cardiac symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks (Tr. 243). Dr. Brunkhorst further opined that Mr. Hobson's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation (Tr. 243). According to Dr. Brunkhorst, Mr. Hobson cannot work an eight-hour day (Tr. 243). Dr. Brunkhorst stated that Mr. Hobson could walk one mile without rest or severe pain, but could stand/walk less than two hours in an eight-hour working day, and would sometimes need to take unscheduled breaks (Tr. 244). Dr. Brunkhorst limited Mr. Hobson to lifting and carrying 10 pounds occasionally, never climbing ladders, and rarely climbing stairs (Tr. 245). Dr. Brunkhorst advised that Mr. Hobson should avoid even moderate exposure to extreme cold, extreme heat, high humidity, soldering fluxes, solvents/cleaners, fumes, odors, and gases, and should avoid

all exposure to cigarette smoke (Tr. 245). Dr. Brunkhorst opined that Mr. Hobson's impairments would product "good days" and "bad days" and that Mr. Hobson would be absent more than four days per month as a result of his impairments or treatment (Tr. 245). Finally, Dr. Brunkhorst commented that he has known Mr. Hobson for 20 years or more and that he is unable to work an eight-hour day because of his several heart problems (Tr. 245). Dr. Brunkhorst's cover letter to Mr. Hobson's attorney stated, in pertinent part:

> [Mr. Hobson] continues to have chest pain, shortness of breath and fatigue resulting from these problems. Mr. Hobson can't work an eight-hour day five days a week. At present time he is driving and delivering parts. Currently, if he works one day, he is so exhausted it takes him the next whole day to rest because of his heart problem.
>
> I have known this patient for twenty years and I would not describe him as being lazy or a malinger. Mr. Hobson has severe Coronary Heart Disease and severe disabilities from this. It is my professional opinion that he is unable to work a steady eight hour job.

(Tr. 248).

## D. Hearing Testimony

Mr. Hobson testified at the hearing before the ALJ that he is a high school graduate and has been previously employed as a machinist, tool maker and CNC operator (Tr. 256). Currently, Mr. Hobson is driving once or twice a week, up to three times a week, eight hours a day, delivering molds for his brother's business (Tr. 256). Mr. Hobson stopped working at his last job in 2001 after he suffered a heart attack (Tr. 258). Mr. Hobson testified that he experiences angina pain maybe once or twice a month (Tr. 260). He gets nauseated, has a burning sensation in his arms, and then his jaw starts hurting (Tr. 260). He takes nitro pills and lies down when experiencing this pain (Tr. 260). He had an episode like this the Friday before the hearing (Tr. 260). His nitro pills give him bad headaches (Tr. 261). Mr. Hobson has to go to bed and sleep all night and is usually feeling pretty good by the next day (Tr. 261).

Regarding the blockage in the arteries in his legs, Mr. Hobson testified that the stents made it better, but that he still has problems (Tr. 262). Specifically, Mr. Hobson claims that his legs feel really rubbery if he stands for a long time (Tr. 263). Mr. Hobson testified that it takes him about 20 minutes to walk a mile, although he must stop and take breaks while doing it (Tr. 264). Mr. Hobson smokes less than a pack of cigarettes a day (Tr. 275). When asked by the ALJ, Mr. Hobson estimated that he could be up on his feet standing or walking maybe four to six hours in an eight-hour day (Tr. 275). He gets leg cramps from stooping, squatting, kneeling or crawling, and his lower back gives him problems when climbing stairs (Tr. 276).

Mr. Hobson also testified that sometimes he has problems with shortness of breath and that his stamina is worse after his second heart attack (Tr. 264). He gets tired much easier and on two or three days per week, has to nap during the day because he gets so tired (Tr. 265). After he spends a day driving for his brother he is very tired the next day (Tr. 265). He can drive to Chicago and back in one day, although he stops every few hours to stretch (Tr. 265, 268). When he drives to Michigan, which is an 11-hour trip one way, he stays overnight and drives back the next day (Tr. 268). He does no loading or offloading (Tr. 271). Mr. Hobson testified that he could not drive for his brother five days per week (Tr. 278). Mr. Hobson has turned down trips when he was not feeling well enough to drive (Tr. 288).

As for his daily activities, Mr. Hobson testified that he gets up, takes his medicine, usually walks six or eight blocks up to the post office to get his mail, and watch his grandson for a couple of hours at most while his daughter gets ready to go to college (Tr. 267). He might tinker around in the yard a little bit, try to mow it (Tr. 281). He can mow half the yard and then has to go inside to take a break because he is sweating hard and is out of breath (Tr. 281). If he is feeling good he goes to the river and fishes from the bank for an hour or so (Tr. 282). If he is not on the road he usually spends his evenings with his wife, and they go and visit friends once in a while (Tr. 282). He goes to bed for the night usually before 10 o'clock (Tr. 280).

Mr. Hobson testified that he would probably lift 50 pounds easy, although he could not do that very often (Tr. 276). Mr. Hobson also testified that he has problems lifting his then three year-old grandson who weighs 28 pounds, and that he can only hold his eight month-old, 21 pound grandson for maybe ten minutes maximum at one time (Tr. 276-77). Mr. Hobson testified that he could maybe sit for three or four hours at a time, or possibly up to six hours in an eight-hour day (Tr. 277).

Mr. Hobson testified that different types of weather do not really both him (Tr. 279). Mr. Hobson testified that he does not see a doctor very often because of financial concerns (Tr. 273). Mrs. Hobson concurred, testifying that neither she nor her husband go to the doctor unnecessarily because of the cost of the co-pays (Tr. 289).

Mrs. Vernetta Hobson, Mr. Hobson's wife, also testified at the hearing (Tr. 284). According to Mrs. Hobson, Mr. Hobson never fully recuperated from his first heart attack in 1998 (Tr. 285). He has a lot of physical problems, i.e., not being able to breathe, chest pain, and lack of energy (Tr. 285). She testified that, following his first heart attack, Mr. Hobson would have to come home in the middle of his work shifts and just was not able to work anymore like he used to (Tr. 285). He got even worse after his second heart attack (Tr. 285). Mrs. Hobson testified that she usually gets home from work around 5:00 p.m., and that three days out of seven Mr. Hobson is in bed sleeping when she gets home (Tr. 286). Mrs. Hobson claimed that Mr. Hobson is in worse shape than he testified to, because Mr. Hobson does not want to sound like a weak person (Tr. 287).

Vocational expert Julie Svec testified at the hearing (Tr. 290). The ALJ posed the following hypothetical question to Ms. Svec:

> My first assumption is that we have an individual who is 50 years old. He was 47 years old as of the alleged onset date of disability. He's a male. He has a high school education, plus he has additional training as a machinist, in blueprint reading, and a CNC operator. And he has past relevant work as you've indicated in Exhibit 16E, and he has the following impairments. He has coronary artery disease status post-myocardial infarctions, and angioplasty with stent placement. He has peripheral vascular disease status - post stenting of the

right common iliac artery. Hypertension, hyperlipidemia. He
has a history of back injury and a history of second-degree
burns. And as a result of a combination of those impairments
he has a Residual Functional Capacity as follows. He cannot
lift more than 50 pounds, routinely lift 25 pounds. Stand or
walk for at least two hours out of an eight-hour day, sit for at
least six hours out of an eight-hour day, and walk for four
blocks at a time. With only occasionally bending, stooping,
squatting, kneeling, crawling, or climbing. He should not
work at unprotected heights. Would this individual be able to
perform any job he previously worked at, either as he
performed it or as it is generally performed in the national
economy? And if so, would you please specify which job?

(Tr. 293-94).

Ms. Svec replied that Mr. Hobson would be able to return to his work as a delivery

driver, as Mr. Hobson described performing that job, but not as it is generally described

in the Dictionary of Occupational Titles (Tr. 294). Ms. Svec testified that the above

described standing and walking limitations would preclude Mr. Hobson from returning to

his previous work as a machinist (Tr. 294). Ms. Svec testified that Mr. Hobson does have

skills acquired from his past work which he could transfer to other work within the

limitations of the hypothetical, i.e., the ability to set up machines according to

specifications, the ability to read and follow work orders or blueprints, and the ability to

use measuring instruments or small hand tools (Tr. 294-95). Ms. Svec identified the

available work as electronics component tester, polisher, and die equipment operator, all

of which are sedentary jobs (Tr. 295).

The ALJ then posed another hypothetical question to Ms. Svec, as follows:

My next hypothetical would be an individual of the same age,
sex, education, past relevant work, and impairments as
previously specified. And this would be an individual who
would have the Residual Functional Capacity as follows. He
could not lift more than 50 pounds, routinely lift 10 pounds.
He could stand or walk for sic to - - for four to six hours out
of an eight-hour day. Sit for six hours out of an eight-hour
day. With no continuous bending, only occasional stooping,
squatting, kneeling, crawling, or climbing. No continuous

11

operation of hand controls with the left hand, which is the minor upper extremity. This individual should not work at unprotected heights or be exposed to more than moderate levels of fumes. Would this individual be able to perform any job he previously worked at, either as he performed it or as it is generally performed within the national economy?

(Tr. 295-96).

Ms. Svec replied that Mr. Hobson would be able to perform the work of delivery driver as he performed it (Tr. 296). When questioned by Mr. Hobson's attorney, Ms. Svec testified that Mr. Hobson would not be employable if he would miss up to four days of work per month due to his impairments (Tr. 297).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

<u>B. ALJ's Disability Determination</u>

Determining whether a claimant is disabled involves a five-step evaluation. <u>See</u> 20 C.F.R. § 404.1520(a)–(f); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

<u>Trenary v. Bowen</u>, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990). (citing <u>Yuckert</u>, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." <u>Frankl v. Shalala</u>, 47 F.3d 935, 937 (8th Cir. 1995) (citing <u>Reed v. Sullivan</u>, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional

capacity (RFC). to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Mr. Hobson had not engaged in substantial gainful activity since his alleged onset date (Tr. 19). At the second step, the ALJ determined that Mr. Hobson has the following severe impairments: coronary artery disease, is status post myocardial infarctions with angioplasties and stent placement, has peripheral vascular disease status post stent placement in right common iliac artery, has hypertension, hyperlipidemia, a history of a back injury and a history of second degree burns (Tr. 19). At the third step, the ALJ determined that Mr. Hobson's impairments did not meet or equal one of the listed impairments (Tr. 19). At the fourth step, the ALJ determined that Mr. Hobson was unable to perform his past relevant work (Tr. 20). At the fifth step, the ALJ found that Mr. Hobson has acquired work skills which are transferable to semi-skilled or skilled work functions of other work within his residual functional capacity, and therefore is not disabled (Tr. 20).

### C. Treating Physician

Mr. Hobson argues that the ALJ erred in failing to identify specific, legitimate reasons for discrediting the opinion of his treating physician, Dr. Brunkhorst, and that this matter should be remanded for further development of the record in this regard. Mr. Hobson notes that Dr. Brunkhorst's opinion was consistent with that of the state consultative examiner, Dr. Nadipuram.

The Commissioner counters that the ALJ properly found that Dr. Brunkhorst's opinion was not entitled to significant weight, i.e., Dr. Brunkhorst's treatment records do not reflect an impairment of the severity indicated on his medical source statement, Dr. Brunkhorst only examined Mr. Hobson on one occasion from January 2003 to February 2004, and that during his November 17, 2003 examination Mr. Hobson reported not using any nitroglycerin since October 2002 and was "doing real well." Additionally, the Commissioner argues that Dr. Brunkhorst's opinion is inconsistent with the other

medical evidence in the record, i.e., normal EKG in January 2002, normal cardiac markers, examining physician opinion that Mr. Hobson's chest pain was most likely musculoskeletal in nature, a consultative examination in June 2002 which revealed only a grade II systolic heart murmur, a negative October 2002 EKG, cardiolite stress testing showing "no significant abnormality" to explain Mr. Hobson's reported symptoms. The Commissioner finally argues that both the opinions of Dr. Brunkhorst and Dr. Nadipuram are inconsistent not only with Mr. Hobson's testimony regarding his daily activities, but also with the opinion of Mr. Hobson's cardiologist, Dr. Pamulapati. The Commissioner contends that Dr. Pamulapati's opinion is entitled to greater weight because he is a specialist.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

With respect to opinions both of Dr. Brunkhorst and the consultative examiner's opinions, the ALJ gave "little weight" to either, finding them to be:

> [C]onclusory and inconsistent with the signs and findings in the clinical notes of record, results of the laboratory and diagnostic tests, claimant's description of his activities of daily living, the claimant's history of treatment as of the alleged onset date and thereafter and the claimant's failure to follow medical advice. Further, neither of these opinions cites [sic] any specific signs or findings or results of laboratory or diagnostic tests that would support their opinions, and in fact, the findings support contradictory conclusions.

(Tr. 18).

Dr. Brunkhorst's findings are no more conclusory than the opinions rendered by the state consultative physicians, or any physician in these cases for that matter. In fact, the forms used by Dr. Brunkhorst in this regard is more detailed than the form used by the state consultative doctors. As for the ALJ's conclusion that Dr. Brunkhorst's opinion was inconsistent with the signs, findings, laboratory and diagnostic tests, this finding was based solely on the ALJ's own interpretation of the medical evidence which, as discussed more fully below, is not proper. See Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003) (reversing and remanding the ALJ's denial of benefits based, in part, on the results of a cardiolite test, noting that the "[t]he record needs to be more fully developed regarding what specifically the cardiolite test results, among other information, means relative to [claimant's] ability to work, and how those particular test results may conflict with other tests in [claimant's] medical records"). At most, the record is deficient in documentation to support Dr. Brunkhorst's opinions. Shontos v. Barnhart, 328 F.3d 418, 426-27 (8th Cir. 2003).

Mr. Hobson and his wife testified that they sought medical treatment only when absolutely necessary due to financial reasons. This testimony stands unrefuted and is credible. Nevertheless, Dr. Brunkhorst has been Mr. Hobson's treating physician for 20 years. The state examining physician agreed with Dr. Brunkhorst that Mr. Hobson was unable to perform competitive employment on a sustained basis. Even the state

consultative physician found Mr. Hobson to be "credible to the extent that he does have a medically determinable impairment that does restrict his function" and that the "evidence in file is consistent with the reports of" Mr. Hobson (Tr. 210). Mr. Hobson's daily activities, even including the days he spends driving truck for his brother, do not undermine Dr. Brunkhorst's opinion that Mr. Hobson would be absent from work more than four days per month, which the vocational expert testified would preclude competitive employment. Mr. Hobson testified that while driving he must stop often and stretch, and that he turns down requests for trips when he is not feeling well. Mr. Hobson's wife testified that she finds Mr. Hobson in bed sleeping three days per week when she gets home from work. While Mr. Hobson's cardiologist, Dr. Pamulapati, offered a conclusory statement that Mr. Hobson's activities did not need to be restricted from a cardiac point of view, Dr. Pamulapati never affirmatively stated that Mr. Hobson was able to maintain competitive employment. Nor did Dr. Pamulapati refute Dr. Brunkhorst's opinion that Mr. Hobson would miss more than four days of work per month due to his impairments. The ALJ erred in discounting Dr. Brunkhorst's opinion.

### D. Mr. Hobson's Residual Functional Capacity

Mr. Hobson next argues that the ALJ's decision regarding his RFC was not supported by substantial medical evidence. Specifically, Mr. Hobson complains that the ALJ's RFC was based upon his own inferences from the medical reports and is inconsistent not only with Mr. Hobson's treating physician and consultative physician, but also with the opinions of the non-examining state agency medical consultants. Instead, the ALJ relied on selected portions of Mr. Hobson's speculative and overstated testimony regarding his abilities.

The Commissioner counters that Mr. Hobson's arguments ignore the opinion of his treating cardiologist, who stated that there was no need to restrict Mr. Hobson's daily activities. The Commissioner further argues that the ALJ's limitations regarding Mr. Hobson's ability to lift were based on Mr. Hobson's own hearing testimony, which is entirely proper. Regardless, even if the ALJ had limited Mr. Hobson to lifting no more

than 10 pounds occasionally, that would not preclude performance of the sedentary jobs cited by the vocational expert and relied on by the ALJ in finding Mr. Hobson not disabled.

Determining a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McGivney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). However, the record "must include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (citing Anderson , 51 F.3d at 779); Later, 245 F.3d at 704(noting that while the ALJ was not "limited to considering medical evidence," the ALJ was "required to consider at least some supporting evidence from a professional."). "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Further, an ALJ "may not draw upon his own inferences from medical reports." Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). "If the ALJ did not believe, moreover, that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [the claimant's] mental impairments limited his ability to engage in work-related activities." Later, 245 F.3d at 706 (citing Nevland, 204 F.3d at 858; 20 C.F.R. § 404.1519a(b)).

As set forth above, too much weight was given to the statement of Mr. Hobson's cardiologist without sufficient development of the record with respect to Mr. Hobson's employment ability, or lack thereof. All that remains to support the ALJ's RFC finding with respect to Mr. Hobson's lifting ability are select excerpts from Mr. Hobson's testimony. For example, Mr. Hobson testified that he could maybe lift 50 pounds,

although not very often.  But when posed with questions regarding holding his 21 and 28-pound grandchildren as reference points, Mr. Hobson testified that he could only hold them for about 10 minutes at a time.  However, this is not determinative as the vocational expert identified sedentary jobs which Mr. Hobson could perform.  As set forth above, the ALJ improperly discounted the opinion of Dr. Brunkhorst that Mr. Hobson would miss four days of work or more per month.  When this restriction was included in the hypothetical, the vocational expert testified that Mr. Hobson would be precluded from competitive employment.

### E.  Failure to Follow Prescribed Treatment

Finally, Mr. Hobson disputes the ALJ's findings that he had failed to follow medical advice by not exercising, not treating his high cholesterol, and by failing to quit smoking.  Mr. Hobson notes that he takes cholesterol medication and has for some time.  Mr. Hobson concedes that there is no indication in the record that he exercises regularly, but notes that there is not evidence that he was not trying to exercise.  Mr. Hobson further notes the ALJ's "unseemly" failure to question him about his exercise habits at the hearing, and argues that the ALJ should have considered whether Mr. Hobson was able to exercise due to his condition.  Regarding his smoking, Mr. Hobson argues that he had good reason to continue smoking, i.e., he was unable to quit.  Mr. Hobson contends that the ALJ should have further developed the record in this regard as to how long Mr. Hobson had smoked, how much he smoked, and what attempts he had made to quit smoking.  Mr. Hobson then cites to several studies and cases confirming the addictive nature of nicotine and the dismal success rates for individuals trying to quit.

The Commissioner argues that an ALJ can consider a claimant's continuing to smoke despite instructions to stop.  The Commissioner further notes that Mr. Hobson refused his physician's offer of pharmacological assistance to stop smoking, and that Mr. Hobson's daily activities are inconsistent with his subjective complaints.  Finally, the Commissioner contends that the ALJ properly noted that the objective medical evidence was inconsistent with Mr. Hobson's ongoing complaints.

"Impairments that are controllable or amenable to treatment do not support a finding of disability, and '[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'" Kisling v. Chater, 105 F.3d 1225, 1257 (8th Cir. 1997) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)). However, "before a claimant is denied benefits because of a failure to follow a prescribed course of treatment an inquiry must be conducted into the circumstances surrounding the failure and a determination must be made on the basis of evidence in the record whether quitting [smoking] will restore [claimant's] ability to work or sufficiently improve his condition." Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000) (citing Roth, 45 F.3d at 282-83; Kirby v. Sullivan, 923 F.2d 1323, 1328 n. 2 (8th Cir. 1991)).

The ALJ noted in his decision that Mr. Hobson smokes less than a pack of cigarettes a day, and that Mr. Hobson has failed to follow Dr. Pamulapati's advice that he quit smoking. At the hearing, however, the ALJ did not ask Mr. Hobson a single question regarding the duration of his smoking habit, efforts to quit, whether he had cut back, etc. Moreover, while common sense would dictate that Mr. Hobson would feel better and be generally healthier were he to quit smoking, there is no evidence in the record that smoking cessation would restore his ability to maintain competitive employment. This basis alone is insufficient to deny benefits.

<u>Reversal or Remand</u>

The scope of a district court's review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides, in part, that:

> [t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> [w]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

Gavin, 811 F.2d at 1201-02.  See also Beeler v. Brown, 833 F.2d 124, 127 (8th Cir. 1987) (although there was no shift in the burden to the Secretary, reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability."); Stephens v. Secretary of Health, Educ., & Welfare, 603 F.2d 36, 42 (8th Cir. 1979) (reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled).  If a remand for "further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984).

Given Dr. Brunkhorst's opinion the proper weight, the record demonstrates that Mr. Hobson cannot maintain regular, sustained competitive employment.  Further hearings would merely delay receipt of benefits.  Reversal for an award of benefits is proper in this case.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed this matter is remanded for an award of benefits.

June 2, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT